UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DANIEL ROBERT WILLIAM STAGNER, | |
| Plaintiff, | Case No. 3:22-cv-00362 |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

## REPORT AND RECOMMENDATION

Plaintiff Daniel Robert William Stagner filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Acting Commissioner of the Social Security Administration (SSA) denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 4.) Stagner has filed a motion for judgment on the record (Doc. No. 13), to which the Acting Commissioner has responded in opposition (Doc. No. 16), and Stagner has filed a reply (Doc. No. 17). Having considered the parties' arguments and the administrative record (Doc. No. 10) as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court deny Stagner's motion and affirm the Acting Commissioner's decision.

# I. Background

## A. Stagner's DIB Application

Stagner applied for DIB on October 5, 2021, alleging that he has been disabled and unable to work since August 1, 2016, as a result of headaches caused by a neck injury, lumbar spine fusion, foot drop of the right foot,[1] shoulder injuries, knee problems, arthritis, and sciatic nerve pain from a back injury. (AR 80.[2]) The Acting Commissioner denied Stagner's application initially and on reconsideration. (AR 89, 98.) At Stagner's request, an administrative law judge (ALJ) held a telephonic hearing regarding his application on February 17, 2022. (AR 30–65, 115–16.) Stagner appeared with counsel and testified. (AR 32, 36–57.) The ALJ also heard testimony from a vocational expert. (AR 57–64.)

## B. The ALJ's Findings

On March 2, 2022, the ALJ issued a written decision finding that Stagner was not disabled within the meaning of the Social Security Act and applicable regulations and denying his claim for DIB. (AR 13–26.) The ALJ made the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2019.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 1, 2016 through his date last insured of June 30, 2019 (20 CFR 404.1571 *et seq.*).

\*　　　\*　　　\*

---

[1]　　Foot drop refers to a patient's loss of ability to dorsiflex the foot such that the patient walks with toes dragging on the ground. 1 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 13:29 (4th ed. updated Oct. 2022); 2 Dan J. Tennenhouse, *Attorneys Medical Deskbook* § 18:4 (4th ed. updated Oct. 2022).

[2]　　The transcript of the administrative record (Doc. No. 10) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

3.    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease, right shoulder superior labrum from anterior to posterior (SLAP) tear, left knee meniscus tear, right knee osteoarthritis, neuropathy right lower extremity (foot drop), obesity, and posttraumatic stress disorder [PTSD] (20 CFR 404.1520(c)).

*       *       *

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

*       *       *

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he could lift and/or carry 11 to 20 pounds occasionally and up to 10 pounds frequently; could stand for 2 hours total in an 8-hour workday; could walk for 2 hours total in an 8-hour workday; and could sit for 6 hours total in an 8-hour workday. He could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; but could never climb ladders, ropes, and scaffolds. He could frequently reach in all other directions, handle, finger, and feel with the bilateral upper extremities; could occasionally reach overhead with the right upper extremity; could frequently operate foot controls with the left lower extremity; could occasionally operate foot controls with the right lower extremity; and should have avoided all exposure to unprotected heights or dangerous machinery. The claimant could also adapt to occasional changes in the workplace.

*       *       *

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

*       *       *

7.    The claimant was born on May 4, 1983 and was 36 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

*     *     *

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2016, the alleged onset date, through June 30, 2019, the date last insured (20 CFR 404.1520(g)).

(AR 15–26.) The Social Security Appeals Council denied Stagner's request for review on May 2, 2022, making the ALJ's decision the final decision of the Acting Commissioner. (AR 1–6.)

## C.     Appeal Under 42 U.S.C. § 405(g)

Stagner filed this action for review of the ALJ's decision on May 18, 2022 (Doc. No. 1), and the Court has jurisdiction under 42 U.S.C. § 405(g). Stagner argues that the ALJ improperly evaluated his headaches, failed to consider Stagner's distinguished military service, improperly considered Stagner's parenting activities, and erred in finding that Stagner can perform jobs that exist in significant numbers in the national economy. (Doc. No. 14.) Stagner further argues that the ALJ's decision "is constitutionally defective" because the federal statute limiting the President's ability to remove the SSA Commissioner, 42 U.S.C. § 902(a)(3), is unconstitutional. (*Id.* at PageID# 730.) The Acting Commissioner responds that the ALJ complied with SSA regulations in reaching her decision, that her determinations are supported by substantial record evidence, and that, even though § 902(a)(3) is unconstitutional, Stagner has not shown the harm required to warrant a rehearing on that ground. (Doc. No. 16.) Stagner filed a reply reiterating his arguments that the ALJ improperly evaluated his headaches and that the jobs she identified as ones he could perform do not exist in significant numbers in the national economy. (Doc. No. 17.)

### D. Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to address the parties' arguments.

## II. Legal Standards

### A. Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

## B.    Determining Disability at the Administrative Level

Stagner applied for DIB under Title II of the Social Security Act, which is an insurance program that "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need." *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). To receive DIB, Stagner must establish that he had a disability on or before the last date he was eligible for insurance under Title II, which is determined based on his earnings record. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.130. "Disability" in this context is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ considers the claimant's work activity. *Id.* § 404.1520(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. § 404.1520(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the

6

ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:16-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted*, 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [his] limitations.'" *Combs*, 459 F.3d at 643 (first alteration in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. § 404.1520(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant's residual functional capacity (RFC) permits him to perform past relevant work, he is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [her] residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. § 404.1520(a)(4)(v).

## III. Analysis

### A. The ALJ's Consideration of Stagner's Headaches

The ALJ addressed Stagner's headaches and underlying neck pain at steps two and four of the DIB analysis, finding that Stagner's headaches were non-severe and that the overall record did not support Stagner's allegations about their limiting effects:

> The claimant . . . alleged that he contends with headaches due to cervical spine pain. However, there were no significant objective medical findings in the record to support that this claimed impairment had more than a minimal limitation on the claimant's ability to perform work activities during the relevant period. Although the claimant complained of headaches at times from the alleged onset date to the date last insured, there are no treatment notes specifically addressing treatment of his headaches besides pain medication which he was taking for his degenerative disc disease and knee osteoarthritis. In April 2016, prior to his alleged onset date, the claimant reported having headaches about once a month. (Exhibit 3F/183.) A [compensation and pension (C&P)] examination at the time noted that due to the claimant's headaches, he would miss at least one day every 2 weeks, but this was based on the claimant's subjective complaints, and he was only taking Tylenol or ibuprofen for his headaches. (Exhibit 3F/279–280.) Then in September 2016, the claimant complained of frequent, though not constant, headaches due to cervical spine pain. (Exhibit 3F/159–160.) In April 2019, he noted that his headaches varied in frequency. (Exhibit 3F/79.) At an appointment in October 2019, a few months after the claimant's date last insured, the claimant denied headaches. (Exhibit 3F/59.) In December 2021, the claimant did report more frequent headaches which is consistent with his testimony that he was having headaches 2 to 3 times a week, but this is more than two years after his date last insured. (Exhibit 4F/34.) The undersigned finds that since the claimant's symptoms from headaches did not more than minimally limit his ability to perform work related activities prior to his date last insured, it is determined to be non-severe. (20 CFR 404.1521 and SSR 16-3p.)

> \*       \*       \*

> [The claimant] has pain in his neck which continues to cause migraines about two to three times a week. These headaches caused him to take breaks or days off of work in the past. He alleged that due to his headaches and PTSD, he would have been off-task to the point of having excessive absences. (Exhibits 8E, 11E, 1F/36, 1F/97–98, and testimony.)

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to have caused the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely

consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The claimant's assertion that he has not been able to work at any time since the alleged onset date through his date last insured is not supported by objective medical evidence. The claimant alleged various impairments, but the medical evidence does not support a finding that any of them were disabling, individually or in combination.

The claimant's treatment records show that he has had imaging and examinations which support some limitations during the relevant period, but not to the extent alleged by the claimant . . . . In June 2014, an MRI of his cervical spine showed mild to moderate cervical spondylosis, with moderate narrowing of the left lateral great recess at C5–6. (Exhibit 1F/40–41 and 3F/242–243.)

*     *     *

A[ ] [physical] examination . . . on September 1[6], 2016, about six weeks after his alleged onset date, . . . showed pain with range of motion and paraspinal tenderness of the cervical and lumbar spine, positive straight leg raising on the left, decreased sensation from the right mid-thigh to toes, and a BMI of 38.8, but also found steady unassisted gait, full strength in the bilateral upper and lower extremities, and no edema. (Exhibit 1F/39.) The claimant was assessed to have lumbar post-laminectomy fusion syndrome at L4–5 and L5–S1; cervical spondylosis; bilateral knee pain with left meniscus tear; right shoulder SLAP tear; and neuropathy to the right lower extremity secondary to injury from a grenade with retained shrapnel. (Exhibit 1F/43.)

*     *     *

In October 2015, a C&P examination of the claimant's cervical spine was unremarkable, including normal range of motion, normal strength, normal sensation, and mild bilateral radiculopathy to the upper extremities, and the claimant's cervical degenerative disc disease was noted to have no functional impact on the claimant's ability to work. (Exhibit 3F/286-291.)

*     *     *

In July 2018, about one year prior to his date last insured, the claimant underwent a physical consultative examination with J. Michael Lynch, M.D. Dr. Lynch diagnosed the claimant with multiple injuries secondary to a grenade explosion; post-laminectomy fusion syndrome; drop foot on the right; radicular neck pain without evidence of stenosis or nerve root impingement on the MRI; muscle contraction versus tension headaches; and torn meniscus in the left knee with unremarkable imaging of the right knee. The examination showed . . . slightly reduced range of motion in his cervical spine and dorsolumbar spine . . . . Dr. Lynch opined that the claimant could lift/carry up to 10 pounds frequently and 20 pounds occasionally; at one time sit two hours, stand one hour, and walk one hour; and in

9

an 8-hour workday could sit six hours, stand two hours, and walk two hours total. He was able to reach in all directions other than overhead frequently; occasional push/pull bilaterally; frequently handle and finger; could operate foot controls frequently on the left; occasionally climb, stoop, kneel, crouch, crawl, and balance; occasionally use motor vehicles; and tolerate frequent exposure to humidity and wetness, to pulmonary irritants, and to noise. (Exhibit 2F.)

In August 2018, at a routine visit with his primary care provider, the claimant reported that his chronic pain was "about the same," noting that he had pain in his knees, shoulder, neck, back, and head, but that his medicine took the "edge" off his pain for about 5 to 6 hours when he took it in the morning, and then he took another dose prior to bed. (Exhibit 3F/102.) An examination was normal including no lower back tenderness, no edema, appropriate affect, and a normal neurological examination. (Exhibit 3F/103.) The claimant was instructed to return in 8 months. (Exhibit 3F/105.) Additionally, a depression and post-traumatic stress disorder screening was negative. (Exhibit 3F/106.)

*       *       *

After reviewing all the medical treatment records, past and present, and listening to the claimant's testimony very carefully, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The overall treatment record during the relevant period, including imaging, does support that the claimant has limitations from his impairments, but does not support that he would have such significant limitations especially as he alleged from headaches or PTSD that would render him disabled. As noted, the claimant has imaging which shows mild to moderate musculoskeletal issues. He does have a foot drop which the undersigned considered in the residual functional capacity and limited the claimant's ability to stand and walk as well as perform postural activities. But overall, the claimant did not have any specialized treatment for his impairments during the relevant period. He just did not receive the type of treatment one typically associates with a totally disabled individual. He has not required any repeated hospitalizations of an extended duration nor needed any frequent emergency room visits due to exacerbations. In fact, his treatment during the relative period was quite conservative, only consisting of pain management and some physical therapy. He did not have any injections, radio frequency ablations, or surgeries; did not see a neurologist or orthopedist; and did not have any formal mental health treatment or take psychotropic medications.

The claimant also had fairly active activities of daily living as described above including hunting for short periods of time, driving, grocery shopping, assisting with simple chores and cooking, and caring for his 5 minor children, including two,

ages 1 and 4, whom he brought to his physical consultative examination in July 2018, and he was caring for them while his wife worked. He held his 1-year-old during most of the examination. He also referenced to being responsible for transportation to and from school for his school-aged children. (Exhibits 2F and 3F/59.) Caring for multiple small children can be quite demanding both physically and emotionally. As a whole, the claimant's activities of daily living during the relevant period suggest greater physical and mental functioning than the claimant has alleged.

(AR 16, 19–22.)

Stagner argues that the ALJ did not comply with Social Security Rulings (SSR) 19-4p, 96-8p, and 16-3p because she did not consider the episodic nature of Stagner's headache symptoms, the impact of Stagner's headaches on his RFC, or Stagner's distinguished military history in evaluating Stagner's testimony and improperly discredited Stagner's testimony about his headache symptoms based on his parenting activities. (Doc. Nos. 14, 17.) The Acting Commissioner responds that the ALJ properly considered Stagner's headache symptoms, military service, and parenting activities under the applicable SSA regulations and that her determinations regarding Stagner's headache symptoms are supported by substantial record evidence. (Doc. No. 16.)

SSR 19-4p "provides guidance on how [the SSA] establish[es] that a person has a medically determinable impairment of a primary headache disorder and how [it] evaluate[s] primary headache disorders in disability claims . . . " SSR 19-4p, 2019 WL 4169635, at *1 (Aug. 26, 2019). The SSA explains that it distinguishes between primary headaches, which "occur independently and are not caused by another medical condition[,]" and secondary headaches, which "are symptoms of another medical condition . . . ." *Id.* at *3. Secondary headaches include, "for example, headache[s] attributed to trauma or injury to the head or neck . . . ." *Id.* at *5. Under SSR 19-4p, secondary headaches cannot qualify as medically determinable impairments (MDIs) for purposes of establishing disability. *Id.* Instead, if a claimant experiences secondary headaches,

the SSA "evaluate[s] the underlying medical condition as the MDI" because, "[g]enerally, successful treatment of the underlying condition will alleviate the secondary headaches." *Id.*

The administrative record shows that Stagner's headaches are caused by his neck pain and do not occur independently, which Stagner acknowledges (Doc. No. 14). Stagner's headaches are thus considered secondary headaches under SSR 19-4p and cannot qualify as a medically determinable impairment. Instead, Stagner's underlying neck pain is the primary condition, and Stagner has not argued that the ALJ failed to properly evaluate his neck pain.[3] (AR 19–21.) Instead, Stagner relies on SSR 19-4p's guidance for the evaluation of primary headache disorder for the proposition that ALJs must "evaluate the frequency, severity and duration of an individual's headaches" and analyze "the episodic nature of an individual's headaches on his or her ability to perform work on a regular and continuing basis." (Doc. No. 14, PageID# 724–25.) Even assuming that SSR 19-4p applies, however, the administrative record shows that the ALJ considered evidence related to the frequency, episodic nature, severity, and duration of Stagner's headaches.

With respect to the frequency and episodic nature of Stagner's headaches, the ALJ considered that Stagner reported having headaches about once a month in April 2016; complained of frequent, but not constant, headaches in September 2016; stated that his headaches varied in frequency in April 2019; denied experiencing headaches in October 2019; and reported having headaches 2 to 3 times a week in December 2021. (AR 16.) With respect to severity, the ALJ considered evidence that Stagner's "headaches caused him to take breaks or days off of work in

_____

[3] The Court notes that the ALJ found Stagner's "treatment during the relative period was quite conservative, only consisting of pain management and some physical therapy" (AR 22), while the record shows that Stagner was prescribed hydrocodone for his neck pain (AR 74, 243–46, 266–69, 293, 324–28, 336). Stagner has not identified this possible discrepancy as an error. *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (holding that administrative errors not raised in proceedings before the magistrate judge are waived).

the past" (AR 19); that Stagner told his primary care provider in August 2018 "that his medicine took the 'edge' off his pain[,]" including "pain in his . . . neck . . . and head," "for about 5 to 6 hours when he took it in the morning" (AR 21); and that Stagner "had fairly active activities of daily living" (AR 22). The ALJ also considered evidence regarding the duration of Stagner's headaches, noting that Stagner's headaches lasted long enough to "cause him to take breaks or days off of work . . . ." (AR 19.) The ALJ explicitly considered Stagner's testimony that, because of his headaches and PTSD, "he would have been off-task to the point of having excessive absences." (*Id.*)

Stagner argues that the ALJ should have included limitations in his RFC based on his episodic headache symptoms. (Doc. Nos. 14, 17.) Specifically, he argues that the ALJ's acknowledgement that his headaches "'varied in frequency' impl[ies] that they were *at times* functionally limiting[.]" (Doc. No. 14, PageID# 725 (quoting AR 16).) As the Acting Commissioner points out, this is a misreading of the ALJ's findings. (Doc. No. 16.) Frequency does not connote severity or intensity. The ALJ found that Stagner's headache symptoms, which varied in frequency, were not severe enough to limit his ability to work. (AR 16.)

Stagner argues that the ALJ violated SSR 96-8p—which sets out the SSA's policies and policy interpretations governing RFC assessments in initial claims for disability benefits, SSR 96-8p, 1996 WL 374184 (July 2, 1996)—by failing to consider "the impact of *both* severe and non-severe impairments on [his] ability to work." (Doc. No. 14, PageID# 723); *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). But the administrative record shows that, after finding Stagner's headaches non-severe, the ALJ considered evidence regarding their effect on Stagner's ability to work. (AR 19–21.) She then

concluded, based on the record evidence, that Stagner's headaches did not impose significant limitations. (AR 22.)

Stagner also argues that the ALJ violated SSR 16-3p—which sets out the SSA's policies and policy interpretations for evaluating claimants' symptoms in initial disability claims, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017)—because she "cherry-picked instances of Stagner not being episodic to support her contention that his headaches were trivial, while simultaneous[ly] ignoring evidence that supports his allegations[.]" (Doc. No. 17, PageID# 758.) Stagner argues that "it is not inconsistent with [his] allegations of disability that when feeling his best, he would assist his children, either at home, at school or with extracurricular activities, assist with household chores or engage in hobbies, such as hunting, which he enjoys." (*Id.* at 757.) An ALJ's findings regarding an individual's symptoms receive "special deference." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). "As long as the ALJ cited substantial, legitimate evidence to support [her] factual conclusions, [the Court is] not to second-guess . . . ." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). The ALJ may not "cherry-pick[ ] select portions of the medical record to discredit [the claimant's] complaints of pain." *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013). However, arguments that an ALJ cherry-picked record evidence are "seldom successful because crediting [them] would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014).

In this case, there is "little indication that the ALJ improperly cherry[-]picked evidence" regarding Stagner's subjective headache symptoms. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). The only specific evidence that Stagner argues the ALJ ignored is evidence of "Stagner's distinguished military record." (Doc. No. 14, PageID# 729; *see also id.* at

PageID# 730 (arguing that the ALJ "ignored the fact [Stagner] was a decorated solider lucky to still be alive").) But Stagner has not cited any authority to support his argument that the fact of his military service should be considered differently from other employment under SSA regulations. The Sixth Circuit has rejected such arguments, finding instead that "'work history'—even commendable military service—'is just one factor among many, and it is not dispositive.'" *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 312 (6th Cir. 2018) (alteration omitted) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)). Further, as the Acting Commissioner points out (Doc. No. 16), the ALJ did consider the fact that Stagner "was in the U.S. Army for about five years from 2002 to 2007, including serving one tour of duty in Iraq, where he was struck by a grenade in 2004 . . . ." (AR 19.)

Stagner has not identified any other specific record evidence supporting his headache symptoms that he argues the ALJ ignored, and the administrative record shows that the ALJ considered evidence supporting Stagner's headache symptoms. For example, the ALJ considered that the U.S Department of Veterans Affairs (VA) determined that Stagner "has a 100% service-connected disability" rating, "30%" of which is based on his "migraines[.]"[4] (*Id.*) The ALJ also considered evidence supporting Stagner's neck pain that is the cause of his headaches. The ALJ considered a June 2014 MRI of Stagner's cervical spine that "showed mild to moderate cervical spondylosis, with moderate narrowing of the left lateral great recess at C5–6." (*Id.*) The ALJ

---

[4]    The ALJ explained, however, that the VA's determinations about Stagner's level of disability are not binding on the SSA because VA determinations are based on VA rules and regulations, which differ from SSA rules and regulations. (AR 20.) *See also* 20 C.F.R. § 404.1504 (stating that, for this reason, "in claims filed . . . on or after March 27, 2017, [the SSA] will not provide any analysis in our determination or decision about a decision made by any other governmental agency . . . about whether you are disabled . . . . However, [the SSA] will consider all of the supporting evidence underlying the other governmental agency['s] . . . decision that we receive as evidence in your claim . . . .").

considered a September 2016 physical examination that "showed pain with range of motion and paraspinal tenderness of the cervical and lumbar spine," based on which a medical provider diagnosed Stagner with cervical spondylosis. (AR 20.) The ALJ also considered a July 2018 physical examination based on which Dr. Lynch diagnosed Stagner with radicular neck pain and tension headaches. (AR 21.) The ALJ did not ignore this evidence or Stagner's testimony about his headache symptoms. Rather, the administrative record shows that she evaluated the evidence and testimony as part of her consideration of the record as a whole and her weighing of all the relevant evidence. *See Johnson v. Comm'r of Soc. Sec.*, No. 21-1384, 2022 WL 740692, at *4 (6th Cir. Jan. 4, 2022) (rejecting claimant's cherry-picking argument where "ALJ did not ignore [claimant's] complaints" and evaluated instead them "as part of his consideration of the record as a whole and his weighing of all the relevant evidence").

Stagner further argues that reversal is warranted because "the ALJ punished [him] for being a father" by considering his parenting activities. (Doc. No. 14, PageID# 730.) SSA regulations instruct ALJs to consider a claimants' "daily activities" in evaluating their symptoms. 20 C.F.R. § 404.1529(c)(3)(i); SSR 16-3p, 2017 WL 5180304, at *7. In considering a claimant's daily activities, an ALJ may properly consider a claimant's ability to care for young children. *See, e.g.*, *Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) (holding that "ALJ . . . properly took into account [claimant's] daily activities, which included caring for two school-aged children and performing household chores"). Stagner has not shown that the ALJ's consideration of the care he provides for his children as part of his daily activities was improper under this standard.

Accordingly, Stagner has not shown that the ALJ's analysis of his headaches violated SSA regulations or otherwise lacks the support of substantial record evidence.

## B. The ALJ's Finding That Stagner Can Perform Work Which Exists In the National Economy

Stagner challenges the ALJ's determination that he can perform work which exists in the national economy. (Doc. Nos. 14, 17.) The Social Security Act provides that, at step five of the DIB analysis,

> [a]n individual shall be determined to be under a disability only if h[e] . . . cannot, considering his age, education, and work experience, engage in any [ ] kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The statute further provides that "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.* The accompanying SSA regulations explain that:

> Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy". We will not deny you disability benefits on the basis of the existence of these kinds of jobs.

20 C.F.R. § 404.1566(b). The regulations further state, however, that "[i]t does not matter whether . . . [w]ork exists in the immediate area in which you live[.]" *Id.* § 404.1566(a)(1).

The determination of whether a claimant can perform work which exists in significant numbers in the national economy "should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). Among the factors judges consider in making "this determination are the extent of a 'claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling

to engage in the assigned work; the isolated nature of the jobs; [and] the types and availability of such work.'" *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 904 (6th Cir. 2016) (alteration in original) (quoting *Hall*, 837 F.2d at 275). There is no "one special number which is to be the boundary between a 'significant number' and an insignificant number of jobs." *Hall*, 837 F.2d at 275.

Here, the ALJ explained her step-five analysis as follows:

The vocational expert testified that given [Stagner's age, education, work experience, and residual functional capacity, he] would have been able to perform the requirements of representative occupations such as the following:

- Document Preparer (DOT 249.587-018): sedentary exertion and unskilled; SVP 2; approximately 16,700 jobs in the national economy;

- Addresser (DOT 209.587-010): sedentary exertion and unskilled; SVP 2; approximately 12,700 jobs in the national economy; and

- Order Clerk (DOT 209.567-014): sedentary exertion and unskilled; SVP 2; approximately 1,930 jobs in the national economy.

In a post-hearing brief, the claimant's representative objected to the vocational expert's testimony regarding job numbers asserting that the jobs did not exist in significant numbers especially when specifically considering the state of Tennessee's population compared to the population of the United States. (Exhibit 11E.) The undersigned has considered the arguments and overrules the objection. The vocational expert testified as to his experience in job placement and to the source of his job numbers. The undersigned credits his experience and education which is supported by his resume at Exhibit 10E. Therefore, the vocational expert's testimony is accepted. Additionally, pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. Moreover, pursuant to 20 CFR § 404.1566, the Agency (hereinafter referred to as "we") considers work exists in the national economy when it exists in significant numbers either in the region where you (hereinafter referred to as "individual") live or in several other regions in the country. It does not matter whether (a)(1) work exists in the immediate area in which the individual lives; (2) a specific job vacancy exists for the individual; or (3) the individual would be hired if he/she applied for work. This regulation further outlines how we determine the existence of work. In 20 CFR § 404.1566(b), it states how we determine the existence of work. Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very

limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy". We will not deny the individual disability benefits on the basis of the existence of these kinds of jobs. If work that the individual can do does not exist in the national economy, we will determine that the individual is disabled. However, if work that the individual can do does exist in the national economy, we will determine that an individual is not disabled. In the present case, the vocational expert identified 3 unskilled jobs based on the residual functional capacity given . . . . The undersigned points out that at least two of the unskilled jobs provided by the vocational expert do exist in significant numbers as there is no evidence that these jobs are isolated and only exist in relatively few locations because there are several thousands of these jobs. The undersigned does recognize that the order clerk job numbers are less than two thousand nationally, which would suggest that this job exists in relatively few locations in the national economy. Therefore, the undersigned finds the order clerk job may not be considered available in significant numbers, but the other two unskilled jobs identified by the vocational expert are found to be in significant numbers for the reasons stated previously. Therefore, other unskilled work is available in significant numbers for an individual to perform. Thus, the undersigned finds that there are unskilled jobs available in significant numbers that the claimant can perform based on the residual functional capacity set forth above . . . .

(AR 25–26.)

Thus, the ALJ applied the correct legal standard and considered the reliability of the vocational expert's testimony and whether the identified jobs were isolated in nature. (*Id.*) The ALJ also considered the extent of Stagner's impairments and the reliability of his testimony elsewhere in her decision. (AR 15–16, 19–22.)

Stagner argues that the ALJ's finding lacks the support of substantial evidence because (1) the ALJ only identified a total of 31,330 jobs nationally that Stagner can perform; (2) Stagner estimates that there are only approximately 642 of those jobs available in Tennessee; and (3) it is unreasonable to expect a veteran with PTSD "to uproot from his support system to take a job in another area of the country[.]" (Doc. No. 14, PageID# 728.) Stagner concedes that ALJs are "no longer required" to analyze "the number of regional jobs" available to a claimant (*id.* at PageID# 726), but he nevertheless argues that the ALJ should have focused on whether Stagner can perform work that exists in significant numbers in the state where he currently lives. As the

19

Acting Commissioner argues (Doc. No. 16), however, that is not what the Social Security Act and its accompanying regulations require:

> Congress . . . [has] clarified that "substantial gainful employment" refers to "work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country," "*regardless of* whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."

*Taskila*, 819 F.3d at 905 (third alteration in original) (quoting Social Security Amendments of 1967, Pub. L. No. 90-248, sec. 158(b), § 223(d)(2)(A), 81 Stat. 821, 868 (1968)). SSA regulations further state that, for purposes of the step-five analysis, "[i]t does not matter whether . . . [w]ork exists in the immediate area in which [the claimant] live[s.]" 20 C.F.R. § 404.1566(a)(1); *see also Taskila*, 819 F.3d at 905 (holding that "[d]isability insurance . . . is not available to fund [a claimant's] decision to live far from his job" (third alteration in original) (quoting *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999))).

Stagner argues that the ALJ violated Social Security Administrative Message 17049 (AM-17049), which requires ALJs evaluating PTSD claims to "'consider psychosocial supports, structured settings, living arrangements, and treatment in reaching a determination.'" (Doc. No. 14, PageID# 728 (quoting Off. of Ret. & Disability Pol'y, Soc. Sec. Admin., AM-17049, Policy Reminders for Evaluating Posttraumatic Stress Disorder (PTSD) (2017)). AM-17049 provides guidance for evaluating the severity of a claimant's PTSD at steps two and three; it does not address the step-five analysis regarding jobs available in the national economy. The ALJ determined at step two that Stagner's PTSD is non-severe, and Stagner has not challenged that finding. Stagner has not pointed to any authority applying AM-17049 at step five, and the Court is not aware of any. *Contra Curtis v. Berryhill*, No. 1:16-CV-00059, 2017 WL 1015853, at *3 (W.D. Ky. Mar. 15, 2017) (finding that ALJ identified significant number of jobs in national economy for claimant with PTSD without addressing psychosocial supports, structured settings,

living arrangement, or PTSD treatment at step five). Even if AM-17049 applies at step five, Stagner has not identified any record evidence regarding his psychosocial supports, structured settings, living arrangements, or PTSD treatment to demonstrate that he is unable to travel or relocate to engage in the jobs the ALJ identified in the national economy. *See Taskila*, 819 F.3d at 904 (holding that one factor relevant to determining whether significant work exists in the national economy is "'the distance claimant is capable of travelling to engage in the assigned work'" (quoting *Hall*, 837 F.2d at 275)).

Stagner points to four cases in which district courts in this circuit found that the identification of between 16,900 and 60,000 available jobs nationally did not constitute significant numbers of jobs under 42 U.S.C. § 423(d)(2)(A). (Doc. No. 14, PageID# 727 (first citing *Mackins v. Astrue*, 655 F. Supp. 2d 770, 773 (W.D. Ky. 2009) ("The Court is not aware of any controlling authority which finds 900 jobs in the state or 60,000 jobs in the nation to represent a 'significant' number of jobs in the national economy."); then citing *West v. Chater*, No. C-1-95-739, 1997 WL 764507, at *3 (S.D. Ohio Aug. 21, 1997) ("In this case, the Court finds as a matter of law that 100 jobs locally, 1,200 jobs statewide and 45,000 jobs nationally do not constitute a significant number of jobs under 42 U.S.C. § 423(d)(2)(a)."); then citing *Tapp v. Sec'y of Health & Hum. Servs.*, No. 1:90CV1214, 1991 WL 426310, at *1 (N.D. Ohio July 18, 1991) (finding that 200 jobs locally, 400 to 500 jobs regionally, 1,500 to 2,000 jobs statewide, and around 30,000 jobs nationally did "not represent employment opportunities existing in significant numbers in the local and/or national economy"); and then citing *Malone v. Astrue*, No. 3:10-cv-01137, 2012 WL 1078932, at *6 (M.D. Tenn. Mar. 30, 2012) (finding that "16,900 jobs in the national economy and 239 jobs in Tennessee do not constitute a significant number")).) Stagner concedes, however, that the Sixth Circuit's later opinion in *Taskila v. Commissioner of Social Security*, 819 F.3d 902 (6th Cir. 2016),

"appears to be controlling[.]" (Doc. No. 14, PageID# 727.) In *Taskila*, the Sixth Circuit rejected the claimant's argument that 6,000 jobs nationwide did not amount to a significant number of available jobs and held instead that "[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant.'" 819 F.3d at 905. In so doing, the *Taskila* court emphasized that "the significant-numbers inquiry" is "a fact question reviewed for substantial evidence" and not "a legal question reviewed as a matter of statutory interpretation." *Id.* Stagner argues that *Taskila* is distinguishable because the claimant in that case "was not a veteran, was not wounded during war, did not experience episodic limitations, *i.e.*, debilitating headaches, that at times preclude performance of basic work functions, and was less limited than Stagner." (Doc. No. 14, PageID# 727.) But Stagner has not identified any authority to show that veteran status is relevant at step five, and the ALJ found that Stagner's headaches were not so debilitating as to preclude him from performing all work. That finding is supported by substantial record evidence for the reasons explained above. Finally, Stagner argues that *Taskila*'s holding "should be reevaluated in a post-COVID world." (*Id.*) But Stagner has not explained what impact he believes the COVID-19 pandemic has had on the availability of the jobs the ALJ found that Stagner could perform.

### C. Stagner's Constitutional Argument

Finally, Stagner argues that the ALJ's decision is constitutionally defective because 42 U.S.C. § 902(a)(3)—which provides that "[a]n individual serving in the office of Commissioner [of Social Security] may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office"—is unconstitutional under the Supreme Court's recent decision in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020). (Doc. No. 14.) In *Seila Law LLC*, the Supreme Court "held that Congress could not limit the President's power to remove the Director of the Consumer Financial Protection Bureau (CFPB) to

22

instances of 'inefficiency, neglect, or malfeasance'" because doing so "violate[d] the separation of powers." *Collins v. Yellen*, 141 S. Ct. 1761, 1783 (2021) (quoting *Seila Law LLC*, 140 S. Ct. at 2197). Stagner argues that § 902(a)(3) is similarly unconstitutional, that "[t]he appointment of Andrew Saul as a single Commissioner of SSA who is removable only for cause and serves a longer term than that of the President violates Separation of Powers[,]" and that "the decision in this case, by an ALJ who derived their authority from Mr. Saul, is constitutionally defective." (Doc. No. 14, PageID# 730.)

The Acting Commissioner agrees that the removal restriction in § 902(a)(3) is unconstitutional. (Doc. No. 16.) She argues, however, that Stagner has not shown he is entitled to reversal on this ground because the Supreme Court's decision in *Collins* requires a plaintiff challenging a removal restriction to show that the removal restriction caused him actual harm to obtain relief, and Stagner cannot make that showing here. (*Id.*) Stagner has not responded to the Acting Commissioner's argument.

While Stagner argues that the ALJ derived her authority from Commissioner Saul (Doc. No. 14), public records show that Acting Commissioner Kijakazi was appointed to replace Commissioner Saul on July 9, 2021, approximately three months before Stagner filed his initial DIB application on October 5, 2021. *Soc. Sec. Admin.—Legality of Serv. of Acting Comm'r*, B-333543, 2022 WL 326059, at *2 (Comp. Gen. Feb. 1, 2022). Stagner has not argued that the removal restriction in § 902(a)(3) applies to the Acting Commissioner. Further, the Acting Commissioner is correct that Stagner "must 'demonstrat[e] that the unconstitutional provision actually caused [him] harm'" in order to obtain relief on this ground. *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (first alteration in original) (quoting *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021)); *see also Collins*, 141 S. Ct. at 1788–89 (remanding for

determination of whether unconstitutional removal provision inflicted harm). Stagner has not argued that the removal restriction in § 902(a)(3) caused him actual harm. He therefore has not shown that he is entitled to relief on this ground.

## IV.      Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Stagner's motion for judgment on the record (Doc. No. 13) be DENIED and that the Acting Commissioner's decision be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 6th day of January, 2023.

ALISTAIR E. NEWBERN
United States Magistrate Judge